

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00002-CV

IN THE INTEREST OF J.A.G.,
A CHILD

-----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

-----------

## MEMORANDUM OPINION[1]

-----------

Sixteen-year-old Appellant J.B.G., of whom the Texas Department of Family and Protective Services (TDFPS) has managing conservatorship, appeals the trial court's order terminating her parental rights to her three-year-old son, J.A.G. After a bench trial, the trial court found by clear and convincing evidence that Appellant (1) engaged in conduct or knowingly placed J.A.G. with persons who engaged in conduct which endangered his physical or emotional well-being and (2) knowingly placed or knowingly allowed J.A.G. to remain in conditions or surroundings which

---

[1] *See* Tex. R. App. P. 47.4.

endangered his physical or emotional well-being.[2] The trial court also found that termination of Appellant's parent-child relationship with J.A.G. would be in his best interest.[3] In five points, Appellant contends that the evidence is legally and factually insufficient to support the endangerment findings and insufficient to support the best interest finding. Because we hold that the evidence is legally and factually sufficient to support all the trial court's findings, we affirm the trial court's judgment.

As we have explained in a similar case,

> Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.
>
> . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.
>
> To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine

---

[2] ... *See* Tex. Fam. Code Ann. § 161.001(1) (D), (E) (Vernon Supp. 2010).

[3] ... *See id.* 161.001(2).

2

whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. Thus, parental and caregiver illegal drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being. . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.[4]

The trial court heard the following evidence. Before the referral culminating in this case, Appellant's immediate family had been the subject of many referrals. Her mother (Grandmother) had prostituted herself and Appellant in exchange for drugs. J.A.G.'s birth father (Father) was twenty-one years old at the time of J.A.G.'s conception, and at some point during their relationship, Father and Appellant lived together in his aunt's trailer. Based on Father's relationship with twelve-year-old Appellant, encouraged by Grandmother and condoned by his family, Father was later convicted of aggravated sexual assault of a child and sentenced to seven years in prison.

Appellant testified that when Father discovered that she was pregnant, he told her that it was best that she be with Grandmother, who was threatening him "about money." Appellant then went back to Grandmother, and Father disappeared. Appellant testified that she was still not in a position to take care of herself at that

---

[4] *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (citations omitted); *see also In re J.O.A.*, 283 S.W.3d 336, 345–46 (Tex. 2009).

3

point because of her age. She explained that during her pregnancy with J.A.G., "It was a rough time because . . . me and my mom were living in a home. And my mom . . . got mad at me because there was no money . . . to pay the hotel room. And sometimes . . . she hit me in my stomach." Appellant also testified that she "had to insist" that Grandmother take her to the doctor during the pregnancy and that she would walk if Grandmother would not take her to the doctor. Appellant gave birth to J.A.G. two days after her thirteenth birthday.

Appellant did not like living with Grandmother, who hit Appellant and threw things at her. Appellant did not report Grandmother's abuse because Grandmother threatened to have J.A.G. removed from Appellant and convinced Appellant that she and J.A.G. would be mistreated in foster care. So even after CPS began a family-based services case, Appellant left home for a time with J.A.G.

In June 2008, after Appellant and J.A.G. had returned home, TDFPS removed Appellant and J.A.G. from Grandmother's custody. Father's parent-child relationship with J.A.G. and Grandmother's parent-child relationship with Appellant were ultimately terminated. Neither Father nor Grandmother is a party to this appeal.

After the removal, Appellant and J.A.G. were initially placed together in an emergency shelter. About two weeks later, they were placed together in Seton Home, a San Antonio placement for teens with children or teens expecting children. David Gandara, the original TDFPS caseworker for both Appellant and J.A.G., testified that TDFPS originally planned for Appellant and J.A.G. to stay at Seton

Home until a parent (presumably Appellant's father, E.G. (Grandfather)), could complete a service plan successfully. Then, TDFPS would conduct a monitored return of Appellant and J.A.G. to Grandfather.

While living in Seton Home, Appellant had individual therapy, group therapy, anger management, and parenting classes. Gandara testified that she told him repeatedly that she did not need individual counseling and "that it wasn't for her." According to Gandara, Appellant had verbal and physical disputes while at Seton Home but minimized her involvement. He testified that she tended to claim that she did not remember much when confronted about her misconduct.

Appellant had a fight at school that she claimed was not physical; she was charged with retaliation. She was blamed for chipping paint off a wall at school but told Gandara that she was not involved. Gandara spoke to no one at Appellant's school. Appellant also skipped school frequently, despite the facts that child care and transportation were provided and her school attendance was court-ordered.

One physical battle occurred in her home at the facility in front of J.A.G. Gandara testified that Appellant had told him that the other girl approached her, "and that's about as far as she remembers. The next thing she knows is they were fighting." Gandara also testified that Appellant changed her story: she originally told him that J.A.G. was about ten feet away; towards the end of her narration the baby was only "a couple feet" away from the fray. At trial, Appellant testified that she had

5

a physical fight with J.A.G. located "one or two feet away." J.A.G. was not physically injured.

At one point, Appellant barricaded herself and J.A.G., along with another teen and her child, in her room. Appellant wrote graffiti signs, gang signs, and a threatening comment on the walls during the incident. She also left the facility twice without permission, at least once with J.A.G. Finally, multiple incident reports indicated that Appellant left J.A.G. unattended in his stroller on occasion.

When Gandara spoke to Appellant about his concern that she was jeopardizing her placement at Seton Home, she told him that she did not like the home and did not want to be there and that that was why she was acting out. She told him that the counseling was "stupid." But she also told him that she liked the parenting classes and believed that they were helping her.

Gandara opined at trial that Appellant's actions at Seton Home indicated that she was not taking matters seriously, she was not sincere in getting better, and her noncompliance with rules and structure was worsening. On May 1, 2009, Appellant asked Gandara what would happen if her conservator, TDFPS, temporarily removed J.A.G. from her care because she was having a lot of difficulties going to school and taking care of a child. Appellant testified that even at Seton Home, where she had a lot of support in taking care of J.A.G., there was "too much pressure" because she had "to do what they [told her] to do."

6

After Appellant and J.A.G. were removed from Seton Home on June 3, 2009, and placed with Grandfather, whose home had been approved by TDFPS for a return and monitor placement. TDFPS provided no services to Appellant and J.A.G. while they lived with Grandfather. Gandara did not visit the home at all before the placement. He also did not visit the home during Appellant and J.A.G.'s twenty-three days there, nor did he know if anyone else from TDFPS had. Appellant testified that a caseworker visited once.

Gandara testified that Appellant told him after the removal from Grandfather that she engaged in frequent unprotected sexual intercourse in Grandfather's home. She also told him that Grandfather was rarely home and that no food or money was available. She testified that the house was dirty and messy when she and J.A.G. arrived. She also testified that Grandfather was not really living in the home and that he was neither helpful nor supportive. Appellant admitted that she had Gandara's telephone number but never called him to report her living conditions, nor did she tell the local caseworker who visited once, because of her fear that TDFPS would take J.A.G. away from her.

Appellant's drug-addicted sister, who worked as a prostitute, and her baby were also staying at Grandfather's house. Appellant admitted that before the "monitored" return, she had told Gandara that her sister no longer lived with Grandfather.

7

Appellant testified that her sister would leave the house and Appellant would "have to stay with [J.A.G.] and her [sister's] son." Appellant "didn't know what to do with two kids." She testified that she "was in too much stress" and "too much pressure" and therefore overdosed on June 28, 2009, on antidepressants belonging to her sister. According to Gandara, Appellant told him that she took the pills to "feel better." She testified that she never passed out, but he testified that he believed that she had.

Cheri Fry, the CASA worker for both Appellant and J.A.G. from the initial removal from Grandmother, testified that Appellant had told her that she had "thought the more pills she took, the better it would make her feel. And so she had taken a lot of them. And then she said that the next thing she knew, she woke up in the hospital. She had—was unconscious."

Appellant testified that her sister was outside with J.A.G. while she was taking the pills but that they came back in. Fry testified that J.A.G. was in the room when Appellant took the pills. Appellant testified that she thought that she had taken all the pills, closed the bottle, and put the bottle "where it belonged." But J.A.G. grabbed the bottle and "one or two" pills that must have "got[ten] stuck" in the cap. Appellant testified that she told her sister to call 911. The baby was found by emergency responders with a pill in his mouth and a pill in his hand. Appellant admitted at trial that the incident endangered J.A.G.

8

Applying the appropriate standard of review,[5] we hold that the evidence is legally sufficient to support the trial court's endangerment findings. Further, applying the appropriate standard of review,[6] we hold that the evidence is factually sufficient to support the trial court's endangerment findings. We overrule Appellant's first four points.

The trial court additionally heard the following evidence. After her overdose, Appellant and J.A.G. were removed from Grandfather's home and placed separately.

After meeting Appellant and a transporter at her new foster home, Gandara could not say unequivocally that he visited her again, although he testified that he "had a coworker that was going through that area stop by at least once." Appellant's foster mother sent her to therapy beginning in August 2009, and Appellant was voluntarily admitted to Millwood Hospital in early September 2009 immediately after a psychiatric evaluation. From the admitted medical records, it appears that Appellant remained at Millwood and then The Excel Center for inpatient care for about two weeks. She was diagnosed with major depressive disorder and placed on antidepressants, a mood stabilizer, and anti-anxiety medication. Despite TDFPS having gained at least temporary managing conservatorship over Appellant more than a year earlier and the reasons for that change in conservatorship, and despite

---

[5] *See In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005).

[6] *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

the separation from her young son and the reasons for that separation, it appears that the September evaluation was Appellant's first psychological or psychiatric evaluation.

After her release from inpatient care, Appellant attended day treatment at The Excel Center. Group therapy records from The Excel Center indicate that Appellant sometimes behaved inappropriately or slept in group therapy, was hypersexualized, minimized her history, and avoided dealing with her feelings and the past. In at least one session, Appellant indicated that she did not want to try to regain custody of J.A.G. The therapist indicated in the notes that Appellant was unwilling to accept responsibility for her behaviors and refused to see the impact of her behaviors on others. The following day, the therapist reiterated in the notes that Appellant was unwilling to accept responsibility for inappropriate behaviors "and make changes that might allow her to see her son or to get custody of her son."

While she was attending day treatment at The Excel Center in October 2009, Appellant engaged in inappropriate sexual behavior with a classmate. On the same day, Appellant was discovered "cutting" or "scratching" herself with her library card. These incidents precipitated Appellant's return to Millwood. Appellant "chose to go" back to the hospital. Appellant's second bout of inpatient care at Millwood and then at The Excel Center ended October 21, 2009, six weeks before trial began.

Her foster mother testified that after Appellant's second hospital stay, she completed her treatment at The Excel Center and returned to public school.

10

Appellant's regular therapist, Laura Greuner, a licensed clinical social worker, testified that she first met with Appellant on July 29, 2009. Greuner again saw Appellant on August 26, September 2, November 4 (after Appellant's treatment at Millwood and The Excel Center), November 18, December 9, and December 12. Greuner opined that Appellant was stable since leaving Millwood in late October 2009 but admitted that part of that conclusion was based on discussions with the foster mother. Greuner explained that Appellant

> doesn't seem as depressed or anxious. She presents herself as more focused, like she has a goal and like she's trying very hard. . . .
>
> . . . .
>
> And I . . . wasn't all for her going to Millwood because I didn't really see her as someone that was—you know, at the time she . . . didn't seem to be severely depressed or acting out suicidally or anything like that. But it seemed like Millwood ended up doing her some good, because, when she came out, it definitely seemed like she had made some progress from where she was before.

Greuner testified that she usually has communication with TDFPS caseworkers during this type of case but had had no communication with caseworkers in this case. She believed that she had left a message with Gandara at the beginning of her professional relationship with Appellant.

Exhibits admitted at trial on Appellant's behalf showed that she was doing fine in school. Appellant's testimony indicates that she has long-term goals of independence but recognized that at the time of trial she was not capable of independently caring for herself and her son. Her testimony also shows an

11

awareness of her mental illness and an acceptance of the potential need for continued medication and counseling. Appellant also admitted in her testimony that she sometimes "black[s] out" when she gets angry.

Fry noted that contrary to Appellant's foster mother's testimony that Appellant had always behaved well in her current placement, Appellant's foster mother had called Fry on average twice a week about behavior and other issues regarding Appellant. Fry testified that termination of Appellant's rights would be in J.A.G.'s best interest, based on the cycle of instability and Appellant's inability to demonstrate that she could "parent [J.A.G.] safely, long term."

Rayanne Climer, who replaced Gandara as both Appellant's and J.A.G.'s caseworker on September 15, 2009, testified that Appellant's foster mother had discussed with her some of Appellant's troubling behaviors, including improper sexual activity, attempted self-mutilation, and violations of rules at The Excel Center. Climer also testified that Appellant's maturity level is lacking and that Appellant has complained to her that it is unfair to expect Appellant to make adult decisions at her age. Appellant's complaints, however, related simply to going to school and obeying rules. Climer specifically testified that Appellant had told her that TDFPS was "expecting a lot of her as a 15-year-old to make adult decisions." Climer admitted that other than court appearances, an October 27, 2009 visit to the foster home was the only time that she met with Appellant before trial.

The evidence is contradictory regarding Appellant's conduct while living with her foster mother, but it is undisputed that at trial, her foster mother supported reunification and was willing to have J.A.G. placed in her home.

Gandara testified that placing J.A.G. with Appellant was not an option because they had been placed together at Seton Home and with Grandfather, and neither placement was successful. But Appellant's foster mother testified that during Climer's October 27, 2009 visit to the foster home, Climer told her and Appellant that if Appellant behaved well for two months, then she could have her son back, and her rights would not be terminated. Appellant testified that Climer had told Appellant and her foster mother that if Appellant "was good several months, possibly two months, that [she could] possibly get [her] son back." Climer conceded that she did tell them that Appellant had a chance of getting J.A.G. back, even though she knew at that time that TDFPS's goal "on paper" was termination. The termination trial began less than six weeks later.

In the more than five-month period between the time they were separated and the day trial began, Appellant and J.A.G. had only about seven visits. Appellant conceded that some of the visits were missed because of her hospital stays and a staph infection. Additionally, Fry stated that when Appellant attended "the Excel program, they didn't want to interrupt her therapy to schedule visits. They thought it was more important to be in therapy. And then after that, I can't tell you why there weren't visits." It is not clear from the testimony who "they" were. Fry testified that

13

she knew of occasions in other cases when weekend visits were held even when therapy was not an issue. Fry also testified that she thought that the inconsistent contact between mother and child was hard on both Appellant and J.A.G.

Climer admitted that a twenty-five-day gap in visits between Appellant and J.A.G. that occurred between October 27 and November 21, 2009, was TDFPS's fault. Both parties indicated that at some point the foster parents of Appellant and J.A.G., not TDFPS, were left with the responsibility of assuring that the mother and toddler had visits.

Climer observed the October 27 visit at Appellant's foster home and agreed "with the testimonies of other people" that J.A.G. and Appellant had a bond.

TDFPS's plan was for Appellant's maternal uncle, A.G., and his wife, L.G., who have been married for twenty years and have two biological children, to adopt J.A.G. L.G. had seen J.A.G. once when he was about two months old.

They are willing and eager to raise and adopt J.A.G., but not Appellant. L.G. explained that she believed that with Appellant's history of running away from foster homes and cutting her wrists, her lack of stability, and the likelihood that she would not improve, her presence in the home would have adverse affects on J.A.G. and the couple's two biological children. A.G. was concerned that Appellant could negatively affect the stability of his own children. Both A.G. and L.G. testified that it would be in J.A.G.'s best interest for Appellant's rights to be terminated.

L.G. testified that she would be willing to allow Appellant to visit J.A.G. as long the visits did not harm him emotionally. L.G. also testified that she would ensure that Grandmother would have no contact with J.A.G.

Based on the appropriate standards of review, we hold that the trial court's best interest finding is supported by legally[7] and factually[8] sufficient evidence. We overrule Appellant's fifth point.

Having overruled all of Appellant's points, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED: November 10, 2010

---

[7] *See* Tex. Fam. Code Ann. § 263.307(a), (b) (Vernon 2008); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *J.P.B.*, 180 S.W.3d at 573–74; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

[8] *See* Tex. Fam. Code Ann. § 263.307(a), (b); *R.R.*, 209 S.W.3d at 116; *H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28; *Holley*, 544 S.W.2d at 371–72.